IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

LANGUAGE LINE SERVICES, INC.,

    Plaintiff,

v.

LANGUAGE SERVICES ASSOCIATES, INC., WILLIAM SCHWARTZ, PATRICK CURTIN, AND DOES 1-50,

    Defendants.

No. CV 10-02605 RS

**ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONVERSION CLAIM, AND DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT**

I.  INTRODUCTION

This is a theft of trade secrets case in which plaintiff Language Line Services, Inc. ("Language Line") alleges that its former employees, individual defendants Patrick Curtin and William Schwartz, took confidential Language Line information to their new employer and Language Line competitor, defendant Language Services Associates ("LSA"). Three motions

for summary judgment or partial summary judgment are currently pending.[1] The first is defendants' motion for partial summary judgment on plaintiff's conversion claims.[2] The second is LSA's motion for summary judgment on the issues of liability, counsel fees and damages under the California Uniform Trade Secrets Act ("CUTSA"), as well as a motion to vacate or modify the injunction currently in place. The third is Language Line's motion for partial summary judgment against LSA and the individual defendants on the issue of liability under the CUTSA for the alleged misappropriation of Language Line's trade secrets.

## II. BACKGROUND

Both Language Line and LSA compete in the business of providing a range of interpretation, translation, and multicultural solutions services to their customers. The alleged trade secrets in this case involve a product line offered by both competitors known as "Over the Phone Interpretation" or "OPI." Customers use this service when translation is required for calls involving non-English speakers. While prices for OPI are set based on a variety of factors, including length of contract, average duration of call, whether special certifications are needed, and language mix composition, Language Line primarily depends on a per-minute fee that is unique to each customer. Business is generated by responding to customer advertisements of need, attending trade shows, working with third-party group providers, and providing sales people within the company commissions as incentives to find and develop business.

Language Line was founded in 1982 and is headquartered in Monterey, California. It generates close to $300 million per year in revenue. LSA was founded in 1991 and is headquartered in Horsham, Pennsylvania. Unlike Language Line, LSA uses independent contractors rather than full-time employees for its translation services. LSA generates about $20 million per year in revenue.

Defendant Curtin worked for Language Line from September 2007 to August 2008 as a salesman. While employed by Language Line, Curtin emailed spreadsheet data, referred to as

---

[1] The individual defendants have styled their motion as one for "summary adjudication." Under Federal Rule of Procedure 56 such a motion is properly labeled as one seeking "partial summary judgment."

[2] LSA has joined this motion, filed by individual defendants.

"the Gmail list," to his personal Gmail account. He then left the industry for about a year due to the non-compete clause in his employment contract before LSA hired him as a National Sales Manager in December 2009. Upon learning of Curtin's new employment, Language Line reminded him in writing of his ongoing confidentiality obligations.

Defendant Schwartz worked at Language Line from May 2008 to February 2010. In January of 2010, before being hired by LSA, Schwartz sent Starla Keith, LSA's Vice President of Sales, a "60 Day Plan" in which he discussed his strategy to bring in new business in his first two months at LSA, and the projected revenue that the business would generate. Schwartz was terminated by Language Line in February of 2010, after it learned he was exploring employment options at LSA. In March of 2010, Schwartz began work as a Strategic Sales Manager at LSA. Also in March of 2010, LSA interviewed, and later hired, David Arblaster, a Language Line senior sales person who is not a named party in this action. During that interview process, Arblaster made a presentation to several LSA senior executives on potential top accounts, identifying the names as well as financial data of select Language Line Customers.

Upon hiring each individual, LSA required him to sign a written acknowledgement that he was not in possession of any trade secrets or confidential information from his former employer and that he would follow LSA policies regarding disclosure of restrictive covenants or non-compete agreements. Because Schwartz came directly from a competitor, he was also required to sign an Addendum to the employment agreement stating he did not possess any property or proprietary information belonging to his former employer.

Curtin and Schwartz worked remotely for LSA from their respective homes in Buffalo, New York. In March of 2010, Curtin joined Schwartz in Schwartz's home for a remotely conducted LSA employee orientation. At that time, Schwartz had not yet been provided a laptop by LSA. As a result, he used a thumb drive to save copies of the LSA training materials. The thumb drive he used contained a Language Line spreadsheet, which has become known as the "September 2009 Report." Schwartz provided Curtin with a copy of the file.

Curtin insists he never saved the Gmail List or the September 2009 Report to his LSA

1 computer, but did use them to create "sublists" of "quality leads" that he promised to share with
2 his sales team. From March 2010 to May 2010, Curtin created several such sublists, which he
3 emailed to LSA sales team members. The sublists created from the September 2009 Report
4 showed the average rate per minute charged for various Language Line customers, but did not
5 indicate the exact contract price each had negotiated with it. The information pertained only to
6 OPI services for customers in the healthcare industry. The sublists created from the Gmail List
7 were contact lists, without financial information.

On May 5, 2010, Bryan Lucas, an LSA sales representative, received a sublist from Curtin. On May 19, 2010, Lucas was terminated, after which he disclosed to LSA's CEO Laura Schriver that he thought Curtin was circulating Language Line information. Schriver asked for a copy of the sublist so she could investigate further. On May 25, 2010, Schriver and Art Seefahrt, LSA's COO, interviewed Curtin. At that interview, Curtin said he would discard any Language Line information immediately. The next day, Lucas emailed a second sublist to Schriver, who forwarded the email to Seefahrt.

On June 14, 2010, Language Line filed this action, claiming that LSA and/or Curtin and Schwartz misappropriated its trade secrets. It also filed an *ex parte* application for a temporary restraining order and an order to show cause regarding a preliminary injunction. On July 12, 2010, the prior presiding judge held a hearing, granted Language Line's application for a preliminary injunction the following day, and assigned a Special Master to handle discovery matters in the case. The preliminary injunction against LSA was based on the actions of Curtin and Schwartz, which the court found to be within the scope of their employment and generally foreseeable to LSA. A motion for reconsideration was denied on September 2, 2010. Subsequently, based on conduct by Schwartz, LSA was held in contempt for violations of the preliminary injunction. LSA terminated Schwartz's employment in 2012.

Curtin testified at his deposition that he did not know the information contained in the September 2009 Report or the Gmail list could potentially constitute "trade secrets." Schwartz similarly testified that Language Line offered no training on its Code of Conduct and never

explained to him what constituted its trade secrets.

The Special Master selected Evolver Legal Services to perform forensic imaging and analysis of LSA's digital assets. LSA and Language Line retained their own forensic experts, who each issued reports. Evolver did not find a copy of the September 2009 Report in the LSA data set. The Report may have existed, however, in "unallocated space" located in the "area or space on the hard drive of a computer that is available to write data to" and is "not viewable to the typical computer user and requires specialized forensic software to view and analyze." Ex. HH, Wolfinger Report.

Following production of the expert reports, in June 2011, LSA filed a motion to vacate or modify the injunction. The Court referred the matter to the Special Master, who recommended that the injunction remain unchanged. The Court adopted the recommendation and LSA took an interlocutory appeal to the United States Court of Appeals for the Ninth Circuit, which on September 24, 2012, affirmed the district court's decision.

The claims for relief which remain in this action are for conversion and misappropriation of trade secrets against all defendants. Language Line seeks to recover a lump sum "reasonable royalty," rather than damages or unjust enrichment against LSA.

### III. LEGAL STANDARD

A. <u>Summary Judgment</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Celotex*, 477 U.S. at 323. A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could affect the outcome of the litigation.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.* at 255.

B. <u>California Uniform Trade Secrets Act</u>

A plaintiff asserting a trade secret misappropriation claim under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ.Code § 3426.1, *et seq.*, bears the burden of proving each element of the claim as to each claimed trade secret. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,* 399 F.Supp.2d 1064, 1072–75 (N.D.Cal.2005). California Civil Code § 3426 codifies the California Uniform Trade Secrets Act. Under that act, a plaintiff must "demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff. (Civ.Code, § 3426.1)" *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003); *see also KLA-Tencor Corp. v. Murphy,* 717 F.Supp.2d 895, 906 (N.D. Cal. 2010) (same).

Under the CUTSA, a "trade secret" is defined to include information that "(1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

### IV. DISCUSSION

*A. Partial Summary Judgment on the Conversion Claim*

Defendants move for partial summary judgment on plaintiff's conversion claim, arguing it is based on the same operative facts alleged in support of plaintiff's CUTSA claim, and therefore preempted. The Court previously denied defendants' motion to dismiss the conversion claim, finding that until a determination as to whether the information plaintiff seeks to protect is deemed a trade secret, it would be premature to decide whether CUTSA preempted such a claim. Plaintiff primarily argues this motion essentially amounts to an inappropriate request for reconsideration of that denial.

Specifically, plaintiff argues defendants have not complied procedurally with Northern District Local Rule 7-9, which requires leave of the court prior to moving for reconsideration. N.D. Cal. 7-9(a). Further, Language Line argues defendants have not demonstrated a material difference in fact or law, the emergence of new material facts or change of law, or a manifest failure to consider material facts or dispositive legal arguments such that relief is warranted. N.D. Cal. 7-9(b); *In re LDK Solar Sec. Litig.*, 584 F.Supp.2d 1230, 1253 (N.D. Cal. 2008). While in the time since the previous motion was decided, defendants have obtained interrogatory responses, plaintiff contends that, because those responses are simply a rehash of the factual averments on which defendants relied in the motion to dismiss, no material change in facts or law has taken place.

The motion to dismiss stage of a case, of course, is distinct from summary judgment. As such, similar arguments may be made at each stage without implicating the rules regarding a motion to reconsider. *See, e.g.*, *J.J. v. Oak Grove Sch. Dist.*, 2011 WL 6329845, fns 7 and 11 (N.D. Cal. Nov. 29, 2011) (explaining that legal arguments brought in a motion to dismiss may be reasserted in a motion for summary judgment); *Verizon Delaware, Inc. v. Covad Comm. Co.*, 232 F.Supp.2d 1066, 1069-70 (N.D. Cal. 2001) (reversed on other grounds) (finding a motion for summary judgment that "recycled" arguments made in a prior motion to dismiss was not procedurally improper). Indeed, while the facts obtained during discovery may be no different from those asserted in the pleadings, such findings are evidence to be considered at the summary judgment stage, not mere allegations to be tested in a motion to dismiss. Accordingly, defendants' motion for summary judgment is procedurally proper and must be considered on its substantive merits.

Relying on both California and federal case law, defendants argue CUTSA preempts common law claims that are based on the 'identical nucleus' of facts as a trade secrets misappropriation claim. "In order to state a claim for conversion, the plaintiff must identify some *property* in which he had *property rights* with which the defendant could, and did, interfere. If the only arguable property identified in the complaint is a trade secret, and the only

basis for any property right is trade secrets law, then a conversion claim predicated on the theft of that property is unquestionably 'based upon misappropriation of a trade secret' and the conversion claim is preempted." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.App.4th 210, 238 (2010) (internal citations omitted, emphasis in original); *see also Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2007 WL 1455903 at *9 (N.D. Cal. 2007) (citing *Digital Envoy, Inc. v. Google, Inc.*, 370 F.Supp.2d 1025, 1033 (N.D. Cal. 2005)) (same); *K.C. Multimedia, Inc.*, 171 Cal.App.4th 939, 958 (Cal. App. Ct. 2009) ("The UTSA therefore 'preempts' all common law claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.'") (citing *Digital Envoy, Inc. v. Google, Inc.*, 370 F.Supp.2d 1025, 1035 (N.D. Cal. 2005)). Defendants establish that, with few differences, plaintiff re-alleges the same facts in support of its conversion claim as it alleges in support of its CUTSA claim in its pleadings and in its responses to discovery questions.

Defendants assert it is not premature for this Court to decide the preemption question, invoking a recent decision in this district that "CUTSA preempts other claims based on the misappropriation of confidential information, regardless of whether the information ultimately meets the statutory definition of a trade secret." *SunPower Corp. v. SolarCity Corp.*, 12-CV-00694 LHK, 2012 WL 6160472, *5 (N.D. Cal. Dec. 11, 2012). In its decision, the court agreed with the *Silvaco* court that, "[t]o permit otherwise would allow plaintiffs to avoid the preclusive effect of CUTSA (and thereby plead potentially more favorable common-law claims) by simply failing to allege one of the elements necessary for information to qualify as a trade secret." *Id.* at *6. Other courts in this district have similarly held that common law claims are preempted by CUTSA when the claims are based on the same nucleus of operative fact. *See, e.g.*, *Heller v. Cepia, L.L.C.*, 2012 WL 13572 (N.D. Cal. Jan. 4, 2012) (concluding the CUTSA preempts common law claims of wrongful taking and use of confidential information, regardless of whether the information constituted a trade secret); *FormFactor, Inc. v. Micro-Probe, Inc.*, 2012 WL 2061520, *7 (N.D. Cal. June 7, 2012) (holding the CUTSA preempts common law claims for breach of confidence and unfair competition because the claims were based on the same

nucleus of operative facts); *see also, RSPE Audio Solutions, Inc. v. Vintage King Audio, Inc.*, CV 12-06863 DDP, 2013 WL 1120664, *3 (C.D. Cal. Mar. 18, 2013) ("Even proprietary information that does not constitute a trade secret may fall within CUTSA's ambit where the basis of the property interest is rooted in the information's private nature."). As plaintiff has failed to show its claim of conversion is based on facts distinct from those on which its CUTSA claim is based, defendants' motion for partial summary judgment on the conversion claim must be granted.

B. *LSA's Motion for Summary Judgment*

1. Liability

LSA moves for summary judgment, arguing it did not know or have reason to know of any improper misappropriation of trade secrets and, moreover, Language Line has not suffered any harm from the alleged misappropriation. It asserts that blame, if any, rests squarely on two "rogue" employees. In support of its position, LSA first argues it did not *improperly acquire* the September 2009 Report or the Gmail list, as neither was saved to a company computer and the company never took any affirmative action to acquire the information or to induce Curtin and Schwartz to breach their duties to Language Line. It then argues it did not *improperly use* the information, as it did not know that Curtin and Schwartz possessed the information and, furthermore, sales people testified the information was commercially useless.

LSA states it had no reason to know the lists were acquired by improper means because Curtin and Schwartz circulated them disguised as generic lead lists. Evidence reflects, however, that LSA knew Curtin and Schwartz were former employees of Language Line and that, prior to being hired, Schwartz sent LSA executives a "60 Day Plan" containing Language Line information.[3] LSA insists, in direct opposition to Language Line's allegations, that the general information contained within the Plan was insufficient to raise any suspicion of

---

[3] LSA states (in a footnote that mistakenly refers to Curtin) that Schwartz's Plan provides no evidence of wrongdoing, as it was drafted in January 2010, and the transfer of Language Line information between Curtin and Schwartz took place in March 2010. *See* LSA Motion at 22, n. 5. This argument fails to consider that Schwartz may have been in possession of confidential Language Line information prior to January 2010. Indeed, courts have found liability under trade secret law even if the information is contained solely within an employee's memory. *See Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1523 (1997) ("knowledge" of customer information found to be misappropriated).

misappropriation. Additionally LSA executives have stated they made clear to Schwartz he should not rely on Language Line information. Nevertheless, such preemptive warnings may be insufficient if a company has "reason to know" of a possible trade secret violation. Whether or not the information contained within the Plan was of the type that should have alerted LSA to the possibility of a violation of trade secret law is a material fact in dispute.

LSA also argues it is entitled to summary judgment, as Language Line has suffered no harm from any alleged misappropriation. *See, e.g.*, *FormFactor, Inc. v. Micro-Probe, Inc.*, 2012 WL 2061520 (N.D. Cal. June 7, 2012) (a plaintiff "could not prevail in the absence of a showing that it was harmed by defendants' use or disclosure of particular trade secrets") (opinion vacated by subsequent stipulation of parties); *Unilogic, Inc. v. Burroughs Corp.*, 12 Cal.Rptr.2d 741, 750 (Cal. Ct. App. 6th Dist. 1992) (granting nonsuit where "there was no point in submitting the liability issue to the jury when there was no basis for a determination of damages"). LSA notes Language Line admits it has lost no business and has not sought to prove unjust enrichment, and asserts that seeking a "reasonable royalty" under CUTSA § 3426.3(b) cannot be a substitute for the threshold element of demonstrating harm. The question of harm in this case, however, is complicated by the fact that the prior presiding judge granted Language Line a preliminary injunction just four months after the allegedly improper information was first disseminated amongst LSA employees. This short period of time provided little time for damages to accrue or for LSA to realize unjust enrichment. Thus, whether harm to Language Line would have resulted in the absence of the injunction is a question of fact that must be determined by a jury.

LSA further argues most of the information contained within the lists no longer has independent economic value. This "fact," however, is also in dispute. Indeed, courts in this district have held that when a trade secret is misappropriated, harm may be presumed. *Western Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, *6 (N.D. Cal. June 9, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *see also Gallager Benefits Servs., Inc. v. De La Torre*, 2007 WL 4106821, *5 (N.D. Cal. Nov. 16, 2007) ("In general, the imminent use of a trade secret

constitutes irreparable harm. This is particularly true when the trade secret is a customer list.") (discussing irreparable harm with respect to a preliminary injunction). Accordingly, to the extent Language Line has not shown tangible harm at this stage does not entitle LSA to summary judgment.

Finally, LSA argues it cannot be liable for the unauthorized actions of Curtin and Schwartz under a theory of *respondeat superior*. LSA contends that applying this theory of liability to a trade secret case would write out the *mens rea* requirement of the statute entirely. The majority view, however, is that the UTSA does not preempt the *respondeat superior* doctrine. *See, e.g., Thola v. Henschell*, 164 P.3d 524, 529 (Wash. App. 2007) ("Courts in California and the federal system have also allowed vicarious liability claims under the UTSA"); *Newport News Industrial v. Dynamic Testing, Inc.*, 130 F.Supp.2d 745 (E.D. Va. 2001) (explaining *respondeat superior* is "a legal precept that presupposes the existence of an underlying claim" and thus is not preempted by the Uniform Trade Secrets Act). Accordingly, LSA cannot prevail at summary judgment merely by arguing that it was not aware of the acts of its employees, and summary judgment, therefore, cannot be awarded on that basis.

Material facts remain as to the degree to which LSA was "put on notice" and whether or not Language Line suffered harm from the alleged misappropriation of its trade secrets. Accordingly, LSA's motion for summary judgment on liability must be denied.

### 2. Damages

LSA contends Language Line's claim for damages must be struck, again based on its contention that Language Line has not asserted a claim for lost profits or unjust enrichment. As discussed above, however, the issuance of a preliminary injunction is sufficient to at least present a question of fact with respect to harm. LSA argues the structure of the CUTSA precludes Language Line from obtaining a reasonable royalty, asserting that such a remedy must instead be an alternative used either when the court lifts an injunction under § 3426.2(b) or if the plaintiff fails to prove lost profits or unjust enrichment under § 3426.3(b). In support of this argument, LSA relies on *Cacique, Inc. v. Reiser & Co., Inc.*, 169 F.3d 619 (9th Cir. 1999) in which the

1 Ninth Circuit found "a reasonable royalty cannot be freely imposed under the law of California.
2 The California legislature has chosen to limit access to reasonable royalties." *Id.* at 624.

3 Language Line clarifies in its response that it seeks a reasonable royalty for past use of
4 trade secrets under § 3426.3(b), and a permanent injunction to prevent future misappropriation
5 under § 3426.2(b). In support of such dual relief, Language Line relies on *AT&T Comm. v.*
6 *Pacific Bell*, 1998 U.S. Dist. LEXIS 13459 (N.D. Cal. Aug. 26, 1998) in which a court in this
7 district issued both a preliminary injunction and a reasonable royalty for past use. In that case,
8 the court rejected the argument that, because defendant had not commercially used the trade
9 secret information, it had reaped no benefit. *Id.* at *5. Rather, the court found that "once
10 defendants accessed the misappropriated [information] from plaintiffs' databases and examined
11 that data they became obligated to pay for their use of that unlawfully acquired information." *Id.*
12 at *7. It is undisputed that here, as in *AT&T*, defendants accessed and examined Language Line
13 data. Whether this finding is sufficient to support a reasonable royalty is, at a minimum, a
14 disputed question of fact. As a result, summary judgment on damages may not be awarded in
15 LSA's favor, and LSA's motion therefore must be denied.

### 3. Attorney Fees and Expert Fees

17 Under the CUTSA, the Court has discretion to award reasonable attorney and expert
18 witness fees if the prevailing party proves there was a willful and malicious misappropriation of
19 trade secrets. CUTSA § 3426.4. *See, e.g.*, *Mattel, Inc. v. MGA Entm't, Inc.* 801 F.Supp.2d 950,
20 956 (C.D. Cal. 2011); *Roton Barrier v. Stanley Works*, 79 F.3d 1112, 1121 (Fed. Cir. 1996).
21 Under general California tort law, an employer shall be liable for exemplary damages only if the
22 employer hired an unfit employee in conscious disregard of the rights or safety of others,
23 authorized or ratified the wrongful conduct, or was personally guilty of oppression, fraud, or
24 malice. Cal. Civ. Code § 3294; *Gucci Shops, Inc. v. Conrad*, 1987 WL 47298, *8 (N.D. Cal.
25 Dec. 17, 1987).

26 Language Line responds that "the determination of willfulness is ordinarily a question of
27 fact for the jury." *Wall Mountain Co., Inc. v. Edwards*, 2009 WL 2524195 *4 (N.D. Cal. Aug.

17, 2009); *Sega Enterprise Ltd. v. MAPHIA*, 948 F.Supp. 923, 936 (N.D. Cal. 1996) ("Generally, a determination as to willfulness requires an assessment of a party's mind, a factual issue that is not usually susceptible to summary judgment"). Language Line has the better argument on this question and therefore LSA's motion to strike is denied.

*C. Language Line's Motion for Partial Summary Judgment*[4]

As noted, to state a claim under the CUTSA, a plaintiff must show that it owned a trade secret, that defendant acquired or used the trade secret through improper means, and that plaintiff suffered harm as a result. Cal. Civ. Code § 3426.1; *Sargent Fletcher*, 110 Cal. App. 4th at 1665. Language Line moves for summary judgment against both LSA and the individual defendants, arguing it has met its burden to prove a violation of the CUTSA. LSA and the individual defendants respond to Language Line's motion separately. LSA primarily contends it cannot be held liable for the acts of two "rogue" employees, while Curtin and Schwartz stress this simply is a case of confusion and bad judgment that was immediately remedied and caused no injury to Language Line.

Language Line first asserts it owned a trade secret in the form of customer lists. Specifically, Language Line contends the September 2009 Report and the Gmail lists were trade secrets, as they contained confidential information regarding the identity of customers and their financial arrangements with Language Line. The California Supreme Court has found "the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of

---

[4] Defendants argue the information on which Language Line relies in support of its motion for partial summary judgment is largely inadmissible. The Ninth Circuit has held that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). If the substance of the evidence is admissible at trial, it may be considered on summary judgment. *Id.* at 1037 (citing *Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990 ) (hearsay evidence produced in affidavit form may be considered on summary judgment if declarant could later present evidence through direct testimony). Upon review of the statements to which defendants object, none appears to be dispositive to the determination of this matter. With respect to defendants' more general objections to declarations as a whole, Ninth Circuit precedent indicates the substance of the information may indeed be considered at the summary judgment stage, regardless of the ultimate admissibility of the evidence in the form provided. Thus, because defendants' objections do not impact the outcome of this motion, they need not be addressed further.

commercial value and not readily ascertainable to other competitors." *ReadyLink Healthcare v. Cotton*, 126 Cal.App.4th 1006, 1020 (2005). *See also, Brocade Comm. Sys. Inc. v. A10 Networks, Inc.*, 873 F.Supp.2d 1192, 1214 (N.D. Cal. 2012) (finding "customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences. . . is routinely given trade secret protection."). Customer lists presumably therefore have inherent commercial value and thus are appropriate for trade secret protection under the CUTSA. Language Line has also presented facts that show it made reasonable efforts to keep this information confidential, as it was accessible only with employee IDs and passwords, and employees were told to use Language Line confidential information solely for Language Line purposes. These undisputed facts are sufficient to establish Language Line owned a trade secret.

Language Line next asserts the evidence shows defendants wrongfully misappropriated Language Line's Trade Secrets. In support of this argument, Language Line points to Schwartz taking the September 2009 Report and sharing it with Curtin, who then disseminated sub-lists to members of his sales team. Language Line asserts that when Curtin did so, he knew the lists were comprised of highly confidential information. It further asserts that Curtin's possession of such information was well-known amongst his colleagues, and suggests LSA had a practice of hiring Language Line employees to gain access to this type of information. In his deposition testimony, however, Curtin averred he did not know the information contained within the September 2009 Report and the Gmail List constituted trade secrets. Further, as discussed above, LSA submits it had no reason to know its employees possessed or utilized Language Line information, as it was disguised in the form of generic leads and the original documents were never saved to LSA computer systems. LSA also denies it hired Curtin and Schwartz to obtain a competitive advantage. Thus, a material issue of fact remains as to what Curtin and Schwartz knew at the time they acquired, disseminated, and used the information at issue, and whether or not LSA knew or had reason to know of such misappropriation.

1  Language Line finally contends LSA is liable for the actions of Curtin and Schwartz
2  under the doctrine of *respondeat superior*, as each was acting within the scope of LSA's regular
3  business. Language Line notes that Curtin directed LSA sales associates to target specific
4  Language Line customers and make calls based on the information contained within the sub-lists,
5  as they would do in the normal scope of their sales efforts for LSA. As discussed above, and
6  contrary to LSA's assertions, the doctrine of *respondeat superior* can apply in trade secrets
7  cases. Language Line, however, goes one step too far in arguing the issue of vicarious liability
8  has already been resolved by this Court. The prior presiding judge in this matter ruled on the
9  issue for the purpose of issuing a preliminary injunction, a procedurally and legally distinct stage
10 of the case from the present one. That was a preliminary ruling, and the findings of fact and
11 conclusions of law made by the court at that stage are not binding. *See Univ. of Texas v.*
12 *Comenisch*, 451 U.S. 390, 395 (1981) (explaining the findings of fact and conclusions of law
13 made by a court granting a preliminary injunction are not binding at trial on the merits.").

14 In support of its argument that LSA is liable, Language Line places particular emphasis
15 on a recent Central District of California decision in which the court found a defendant
16 corporation liable under the CUTSA for the acts of its employees and former employees.
17 *Allergan, Inc. v. Merz Pharm., et. al.*, 2012 WL 781705 (C.D. Cal. March 12, 2012). At the
18 outset it bears noting that the *Allergan* decision followed only after trial, not on summary
19 judgment. In its order denying summary judgment, the court found that genuine issues of
20 material fact existed as to whether Allergan has been harmed or will be harmed by defendants'
21 alleged misappropriation. Balding Decl., Ex. 11 at 13. The court further found that genuine
22 issues of material fact existed as to whether information was misappropriated and as to whether
23 the information constituted trade secrets at all. Here, questions of misappropriation and harm
24 similarly exist, and summary judgment is likewise not appropriate. Language Line's motion is
25 therefore denied.

26  D. *Vacate or Reduce Scope of Injunction*
27  LSA asserts this Court has authority to reduce the scope of an injunction at any time, and
28

argues this authority should be exercised to conform the current injunction to the evidence of this case. *See United States v. Swift & Co.*, 286 U.S. 106, 114 ("A continuing decree of injunction directed to events to come is always subject to adaptation as events may shape the need."); *Sys. Federation No. 91 Railway Employees' Dep't. v. Wright*, 364 U.S. 642, 647 (1961) ("a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.").

LSA requests the injunction be vacated in its entirety, or be modified to permit LSA to sell product lines other than OPI to any customer, sell OPI services to customers through third-party negotiated contracts, bid for customers after current financing information is made public, sell OPI to customers on the September 2009 Report sublist whose average rate per minute changed, and sell OPI to all customers who were not on a sublist. LSA contends the information is now stale and thus of less import than at the time the injunction was first imposed. At oral argument, LSA stressed any remaining Language Line information may be removed by a forensic expert, under Language Line's supervision. This, it asserts, addresses any prospect of future misappropriation of any proprietary information.

The appropriateness of the scope of the current injunction cannot be determined on the present record. The parties are therefore directed to file further briefing on the issue. LSA's brief shall be due no later than May 24, 2013. Language Line may respond no later than June 7, 2013. Should LSA elect to file a rely brief, it must do so by June 14, 2013. A hearing shall be held on **June 20, 2013 at 1:30 p.m.** in Courtroom 3, 17th Floor, United States Courthouse, 450 Golden Gate Avenue, San Francisco, California on the proper scope of any ongoing injunction.

V. CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment on the issue of conversion is granted. LSA's motion for summary judgment is denied. Language Line's motion for partial summary judgment is also denied.

A further Case Management Conference shall be held on **July 18, 2013 at 10:00 a.m.** in

1  Courtroom 3, 17th Floor, United States Courthouse, 450 Golden Gate Avenue, San Francisco,
2  California. The parties shall file a Joint Case Management Statement at least one week prior to
3  the Conference.

5       IT IS SO ORDERED.
6  Dated: 5/6/13

                                  RICHARD SEEBORG
                                  UNITED STATES DISTRICT JUDGE